# EXHIBIT 7

1

G6ndgium

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    VIRGINIA L. GIUFFRE,

4              Plaintiff,              New York, N.Y.

5         v.                          15 Civ. 7433(RWS)

6    GHISLAINE MAXWELL,

7              Defendant.

8    ------------------------------x

9                                     June 23, 2016
                                      12:19 p.m.
10
     Before:
11
                    HON. ROBERT W. SWEET,
12
                                      District Judge
13
                         APPEARANCES
14
     BOIES, SCHILLER & FLEXNER LLP
15        Attorneys for Plaintiff
     BY:  SIGRID S. McCAWLEY
16        MEREDITH L. SCHULTZ

17   HADDON MORGAN AND FOREMAN, P.C.
          Attorneys for Defendant
18   BY:  JEFFREY PAGLIUCA
          LAURA A. MENNINGER
19
     DAVIS WRIGHT TREMAINE LLP
20        Attorneys for Respondent Sharon Churcher
     BY:  ERIC J. FEDER
21
     LAW OFFICES OF GREGORY L. POE PLLC
22        Attorneys for Respondent Jeffrey Epstein
     BY:  GREGORY L. POE
23        RACHEL S. LI WAI SUEN

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300

G6ndgium

1           (Case called)

2           THE COURT:  Extending discovery.

3           MS. McCAWLEY:  Yes, your Honor.  This is Sigrid

4    McCawley on behalf of the plaintiff, and we had filed a motion

5    for additional time to complete six depositions.  Your Honor

6    may recall that we received an order on Monday that allowed for

7    alternative services to three of the witnesses that we were

8    seeking to depose.  Our discovery cutoff right now is set for

9    June 30th, which is I believe next Friday, if I'm correct.  So

10   at present we have six witnesses that we still need to depose,

11   the three that we had alternative service for, and then we have

12   Mr. Ross GOw, who was the defendant's agent who issued the

13   defamatory statement, Mr. Brunel --

14          THE COURT:  How much time do you want?

15          MS. McCAWLEY:  Sorry.  We were requesting 30 days to

16   complete those depositions to coordinate with their counsel and

17   then coordinate with the defendant's counsel and get those set,

18   and I believe we can do that without altering the Court's

19   deadline for a trial, which is set presently for November --

20   I'm sorry, October 17th.

21          THE COURT:  OK.  What is wrong with that?

22          MR. PAGLIUCA:  Your Honor, in theory, initially there

23   is nothing wrong with that.  It seems to me that we're not

24   going to complete a variety of discovery issues by July 1.  The

25   problem, I think, your Honor, is the cascading effect of that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

G6ndgium

1    extension.

2              And if I could digress for a moment and just a moment?

3    When we were here I think in March, the Court raised the issue

4    of was this enough time for discovery at that time.  I told the

5    Court I didn't think so, and I didn't think that the trial date

6    was reasonable as a result of what I perceived to be problems

7    going forward with discovery.  Counsel on the other side

8    opposed my suggestion as to extension of time at that point and

9    we proceeded.  The Court agreed with the plaintiff and not with

10   me.

11             The problem I see, your Honor, is that now we are

12   scheduled to have expert disclosures due in July, dispositive

13   motions in August, and a trial date in October.  I don't

14   believe that it is feasible, if we continue discovery out until

15   the end of July, to have expert discovery done by the end of

16   August.  I don't believe it is going to be feasible to have

17   dispositive motions completed in the time set by the Court, and

18   all of that is going to push into whether or not we have an

19   October 18th trial date.

20             I think the Court also needs to consider, your Honor,

21   and of course is now familiar with the volume of paper that

22   gets filed in this court on a regular basis at all hours of the

23   day and night, and I anticipate that there are going to be

24   significant evidentiary issues that the Court is going to need

25   to rule on in advance of trial.  The Court sees a harbinger of

4

G6ndgium

1     those issues today, I think, as a result of these subpoenas.

2     All of that tells me that the prudent course of action in my

3     view is to sort of try to sit down and rework some of these

4     discovery deadlines with an idea that we're going to actually

5     have realistic dates.

6            THE COURT:  OK.  Good.  I'll extend the deadline 30

7     days.  I'll direct counsel to meet and confer and see if they

8     can come up with a schedule that both sides will agree upon.

9            Second, the plaintiff wants to maintain certain

10    confidentiality designations.  What is the problem?

11           MS. McCAWLEY:  Yes, your Honor.

12           So, with respect to our revised Rule 26 disclosures,

13    we, in order to divulge all information relevant to the case,

14    had a list of individuals on there who are allegedly victims of

15    sexual abuse themselves as minors or witnessed things.  So we

16    designated under our protective order in this case that Rule 26

17    disclosure as confidential.  It was challenged under the

18    Protective Order.  Once it is challenged, we have a ten-day

19    window to file something with the Court.  So we filed our

20    motion for the protective order.

21           On Friday of this past week, on the 17th, they issued

22    a new -- defendants issued a new Rule 26 disclosure with 42 new

23    names on it, those of which were on our disclosures, without

24    marking it as confidential.  So I sent them an email just

25    asking them to hold that as confidential until the Court has an

5

G6ndgium

1   opportunity to rule on whether or not those names can remain

2   confidential under the protective order.  So that is the status

3   as we are right now.

4           So we are awaiting a ruling.  We believe those

5   individuals should be protected under the Court's protective

6   order and those names kept confidential during the course of

7   this, and it is my understanding that defendants oppose that

8   position.

9           THE COURT:  What is the attack?

10          MR. PAGLIUCA:  Well, your Honor, under the terms of

11  the protective order, certain categories of information is

12  likely confidential.  People's names, in my view, are not

13  confidential.  I didn't choose to list these folks in what I

14  understand is a Rule 26(a) disclosure, which is a good faith

15  disclosure of people who may have information relevant to the

16  claims or defenses in the case.  That's their listing.  All it

17  is is the names of people.

18          I have absolutely no idea or ability to understand why

19  someone's name could be considered to be confidential.  It is

20  their name.  They use it every day.  They walk around with it.

21  They have a driver's license with it.  I don't understand how

22  names in a 26A(a) disclosure could be deemed confidential.

23          And what I view this as is just simply, you know,

24  another step in the process here of preventing access and use

25  of information.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

G6ndgium

1           THE COURT:  Well, you've got the information.

2           MR. PAGLIUCA:  I do have the information.

3           THE COURT:  Yes.

4           MR. PAGLIUCA:  Why is it confidential?

5           THE COURT:  Why?

6           MS. McCAWLEY:  May I address that, your Honor?  Did

7     you want me to address that?

8           THE COURT:  Yes.

9           MS. McCAWLEY:  Sorry.  So with respect to the reason

10    why individuals who may have been victims of sexual assault

11    would be confidential, there is case law that we cite in our

12    brief, Doby v. Evans, which deals with using, for example,

13    pseudonyms of victims --

14          THE COURT:  Let's just -- I think we can shorthand in

15    the context of the patois of this case.

16          Victims.  OK.  You want to maintain the

17    confidentiality of the identity of the victims.  OK?

18          MS. McCAWLEY:  Yes, your Honor.

19          THE COURT:  Beyond that?

20          MS. McCAWLEY:  Right.  Beyond that we are fine.

21          THE COURT:  OK.  All right.  That will be maintained.

22          MS. McCAWLEY:  Thank you.

23          THE COURT:  Apple and Microsoft.  Let me ask the

24    defense, seems to me the law bars the subpoenas.

25          MR. PAGLIUCA:  I don't understand why, your Honor.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

G6ndgium

1    think it's a legitimate Rule 45 subpoena.  I don't understand

2    why it would be barred under Rule 45.  There is no objection by

3    the providers of the information.  They have indicated to us

4    that if there is a release that's provided to them by the

5    plaintiff, they will turn over the information.  And I don't

6    understand what the problem is.  This is information indeed,

7    your Honor, that the plaintiffs are required to produce to us

8    under our discovery requests and have not, which resulted in

9    these Rule 45 subpoenas.  After the Rule 45 --

10            THE COURT:  Well, as far as Apple, my understanding

11    about Apple is that with respect to that, that material has

12    been reviewed by counsel and everything has been turned over

13    that's appropriate.

14            MS. SCHULTZ:  That is correct, your Honor.

15            MR. PAGLIUCA:  Well, if that's true, your Honor, then

16    the issue is moot and I agree.

17            THE COURT:  If what?

18            MR. PAGLIUCA:  The issue is moot if that is true.

19            THE COURT:  So Apple is out.

20            Now, the problem with Microsoft, I'm not quite clear.

21            MR. PAGLIUCA:  The problem for me or the problem for

22    them?

23            THE COURT:  The problem for the plaintiffs.

24            MS. SCHULTZ:  Thank you, your Honor.  Meredith

25    Schultz, from Boies, Schiller & Flexner, on behalf of Ms.

8

G6ndgium

1    Giuffre.  My client had two email accounts with Microsoft.

2    They are personal emails accounts.  We have not been able to

3    access that.

4           THE COURT:  Why not?

5           MS. SCHULTZ:  Well, it appears for one -- there is one

6    called live.com, and it appears for that, that that has been

7    administratively deleted.  I don't have personal knowledge of

8    that, but when you put in the email address to try to recover

9    it, I get a message saying we don't recognize this one, "this

10   one" being the email address.  That is Exhibit 1 to our brief

11   on this matter.

12          We wrote a letter to opposing counsel citing some

13   governing provisions of Microsoft's email policy that indicates

14   that due to inactivity they delete accounts after a certain

15   amount of time.  It's my understanding that that has happened

16   to that account but I can't say so for sure.  So we are unable

17   to access that whatsoever.

18          The second account is a hotmail.com account.  We have

19   also been unable to access that.  It appears that it still

20   exists, but despite multiple and diligent attempts to get into

21   that account, we have been unable to.  And I have been involved

22   in those attempts myself personally.  Accordingly, we have

23   captured and produced every electronic document to which we

24   have access.

25          And I'd like to speak a minute about the legality of

G6ndgium

```
1    the Microsoft subpoena.  Even under Rule 26, it is a hopelessly
2    broad subpoena.  It is abusive civil discovery and on the face
3    of it appears to violate the Electronic Communications Privacy
4    Act and the Stored Communications Act, federal laws.  The email
5    seeks -- excuse me.  The subpoena seeks every email that has
6    ever been sent to that account or sent from that account.
7    That's every single personal email.  This is without
8    limitations, without exceptions, without a timeline.  And
9    pursuant to these subpoenas, these emails are to be turned over
10   to defense counsel.  So, plaintiff's counsel would not have an
11   opportunity to review for attorney-client privilege email,
12   review for relevance, and it wholly circumvents the protections
13   of the discovery process, which is why courts who have looked
14   at this issue have consistently rejected these broad subpoenas.
15          Defendants know that they are not entitled to every
16   single personal email plaintiff has ever sent or ever received
17   in the course of however many years these accounts were open.
18   In fact, Judge Kozinski in the Ninth Circuit allowed a civil
19   suit against those who propounded these improper subpoenas, and
20   that was with regard to a professional email account, as
21   opposed to personal email accounts, the issue in this case
22          THE COURT:  Do we know what the date of this account
23   is?
24          MS. SCHULTZ:  It's an old account.  I think, 2011 -- I
25   know that it was -- at least one of them was active in 2011.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G6ndgium

1    It's impossible for me to determine at this point when it was

2    opened and when it was last used because we don't have access

3    to them.

4              THE COURT:  Yes.  OK.

5              MR. PAGLIUCA:  Your Honor, this is the problem and I'm

6    going to be frank.  This is a hide-the-ball problem.  They tell

7    us -- so let me backup.

8              We were originally told these are the only email

9    accounts that the plaintiff had.  When we deposed her, we found

10   out about these accounts.  We then get into an issue with

11   counsel telling us, oh, we've done this due diligence search

12   and we can't access any of this information, these accounts are

13   closed.  Well, then we look into it a little bit further and we

14   find out, indeed, the accounts are not closed; indeed, they

15   have been active, and there are indeed emails that are relevant

16   to the issues in this case that were sent and received out of

17   these accounts.  That's a fact here.

18             Now, all they need to do, if they want to avoid

19   electronic privacy issues, is comply with their discovery

20   obligations, execute a release, and send it to Microsoft.

21   Microsoft will then give them the information.  That's what we

22   have been told in response to this subpoena.

23             So to sit here and say, oh, it's overbroad and it's a

24   problem and you can't do it, you know, you can't have it both

25   ways.  You either can't avoid discovery of something that you

G6ndgium

1    are required to give up and then say, gee, we don't have access

2    to it.  That's the conundrum here, your Honor.

3           I'm sorry we are here at this point.  I agree, if

4    there is privileged information in there, maybe somebody should

5    review it.  But when you tell opposing counsel we don't have

6    access to it and the account is closed and that's indeed not

7    true, it seems to me that you have forfeited your ability to

8    then stand up and say the subpoena is overbroad.

9           THE COURT:  Forgive me, but what's the basis upon

10   which you say it's not true?

11          MR. PAGLIUCA:  The account is not closed?

12          THE COURT:  Yes.

13          MR. PAGLIUCA:  Because we have been told that by

14   Microsoft when we issued them the subpoena.

15          MS. SCHULTZ:  Can I address that really briefly?

16          My communications regarding these accounts are in

17   letters that are attached to the briefs in this case.  I never

18   said that the Hotmail account was closed.  I said that we are

19   unable to access it.

20          With regard to the Live.com account, I said it appears

21   to be closed because the website does not recognize the email

22   address.  I never told them that the accounts were closed.

23          I am more than happy to sign a release to Microsoft

24   for any data that they might have to be delivered to

25   plaintiff's counsel, at which point we will be more than happy

G6ndgium

```
 1     to run our search terms, review it, and produce anything that

 2     is relevant.

 3             THE COURT:  That is good.

 4             MS. SCHULTZ:  But the subpoenas are requesting that

 5     all of our data be turned over to defense counsel.

 6             THE COURT:  OK.  Well, so what we'll do is at the

 7     moment -- yes, OK, we'll quash the subpoena on Microsoft, with

 8     the understanding that that's not on the merits and it can be

 9     renewed, if necessary.  Also, on the understanding that the

10     plaintiffs will do whatever is necessary to get access to these

11     accounts, review them, and determine -- treat it as the Apple

12     accounts have been treated.

13             OK.  So that solves that problem.

14             Churcher's motion to quash.

15             MR. PAGLIUCA:  Your Honor, before we move on, I have

16     one point of clarification with regard to the earlier ruling

17     about counsel conferring about scheduling going forward.

18             THE COURT:  Yes.

19             MR. PAGLIUCA:  I understand that to mean we should

20     confer about all of the scheduling issues moving forward.

21             THE COURT:  Which you think are relevant.

22             MR. PAGLIUCA:  Including up to the trial date in this

23     case?

24             THE COURT:  Whatever you think -- if you have a

25     position that you think is now established that we are not able
```

G6ndgium

1       to try the case in October, that's fine.

2               MR. PAGLIUCA:  OK.  Thank you, your Honor.

3               THE COURT:  Whatever.

4               MR. PAGLIUCA:  I just want to make sure I am

5       understanding the Court's order.

6               THE COURT:  Yes, OK.

7               Churcher.  Yes.

8               MR. FEDER:  Eric Felder, from Davis Wright Tremaine,

9       for the movant.

10              THE COURT:  Sure.  Of course.

11              MR. FEDER:  Good afternoon.  My name is Eric Feder

12      from Davis Wright Tremaine, for the movant, Sharon Churcher.

13              My client, Sharon Churcher, is a journalist.  She is

14      currently employed by American Media, Inc., where she is a

15      reporter for Radar Online and the National Inquirer.  And prior

16      to that she worked at the British newspaper, The Mail on

17      Sunday.  She's also worked as a freelance reporter.  And she

18      has been subpoenaed as a third party here to give testimony and

19      to provide documents in this case.  We move to quash the

20      subpoena.

21              As Ms. Churcher states in her affidavit in support of

22      the motion, her entire involvement with this case, with the

23      plaintiff, with the defendant, all of the facts underlying the

24      case was as a reporter seeking to report and publish news

25      stories.  All the documents and the information described in

G6ndgium

1    the subpoena and the document requests, which are quite broad,

2    by the way, and which we have to assume provide the contours of

3    the information they are seeking in deposition, were created or

4    obtained by Ms. Churcher in the course of her news-gathering

5    activities, and much of the information sought was communicated

6    in confidence, as well.  So under the New York State Shield

7    Law, which is the appropriate law and which defendants

8    acknowledge is the appropriate law, not the slightly less

9    protective Federal Reporters' privilege, the defendant has a

10   heavy burden to meet to even obtain nonconfidential

11   information, and confidential information is absolutely

12   privileged.

13        We just received an opposition to our motion which was

14   filed last night after close of business and we've been

15   reviewing it, but much of the substance of it is redacted out

16   pursuant, presumably, to the protective order.  We had

17   previously offered defense counsel to sign the acknowledgment

18   of the protective order, which does provide for disclosure to

19   witnesses and witnesses' counsel.  They didn't take us up on it

20   before.  Obviously, the offer still stands.

21        But what we can say based on what we've seen is that

22   the defendant claims that Ms. Churcher, who they fully

23   acknowledge reported stories about this case -- not this

24   litigation but the underlying case and who first met the

25   plaintiff when she traveled to Australia to interview her in

G6ndgium

1    2011, that she at some point along the way transformed from a
2    reporter reporting news into a friend or a business adviser.
3    It's not clear again because of the redactions when this
4    transformation presumably took place.  But the reality is that
5    that is simply an incorrect characterization of the
6    relationship.
7          Since 2011, and continuing up, frankly, through the
8    present day, Ms. Churcher has continued to cover this story as
9    a reporter, has published stories, including just I think two
10   months ago, often using "Virginia" or her so-called agents as
11   sources, of course most prominently in early 2015, which is
12   what underlies this particular litigation.
13         By its terms, the Shield Law applies to any
14   information obtained or communications made, quote, in the
15   course of gathering or obtaining news for publication.  Now, of
16   course, a reporter's source relationship is complicated.  Not
17   every single interaction or every single communication is going
18   to be an interview with questions and answers that then get
19   published verbatim.  So to the extent that there are particular
20   emails where Sharon provided advice to Virginia, that doesn't
21   transform the overall relationship from reporter and source to
22   adviser and advisee or friend.
23         Reporters communicate with sources in a variety of
24   ways.  A police beat reporter may take a sergeant out for
25   drinks and talk about life in general with no intention of

G6ndgium

1    publishing details but with the intention of maintaining that

2    close source relationship so that when the sergeant comes into

3    possession of information, he's right there as the first

4    recipient of that information.

5            As this Court stated in the Schoolcraft case, that the

6    reporter's privilege seeks to prevent the unnecessary enmeshing

7    of the press in litigation that arises from events they cover.

8    And that's exactly what this is.

9            The Second Circuit interprets the qualified privilege

10   very broadly to apply not only to individual bits of

11   information gathered from sources but also to unpublished

12   details of the news gathering process.  That's from the Baker

13   v. Goldman Sachs case, 669 F.3d 105, from 2012.

14           But either way, what they're seeking here, as

15   described in their opposition, is quintessential news gathering

16   Shield Law material.  They list it at a couple of different

17   points in their brief.  They are asking for Sharon Churcher's

18   interview notes, recordings, memos, and other documentation

19   that are clearly, and concededly by the defendant, from the

20   news gathering process.

21           In order to overcome this Shield Law for even the

22   nonconfidential information, they have to make a clear and

23   specific showing that the information is highly material and

24   relevant, that it's critical or necessary to the maintenance of

25   the claim or defense, and that it is not obtainable from any

17

G6ndgium

1    alternate sources.  So as an initial point, it is quite clear
2    that they haven't exhausted all other sources up to and
3    including the proceedings here today, where they are continuing
4    to seek material from the plaintiff's email accounts, which
5    your Honor just granted an order that would facilitate that,
6    and also the pending motion to reopen plaintiff's deposition.
7    So clearly they haven't exhausted plaintiff as a source.
8          They are also asking for Ms. Churcher's communications
9    with the plaintiff's agents or attorneys or communications with
10   law enforcement about the plaintiff, but we're not aware of any
11   effort to obtain that information from those agents and
12   attorneys or from law enforcement.  Obviously, law enforcement
13   may have their own objections to a subpoena.  And while the
14   defendants may not like what the FBI would say here, but there
15   are certainly alternative sources that they are required under
16   the Shield Law to turn to before seeking this from a reporter.
17         In addition, the information -- again, we haven't seen
18   precisely what it is because it is blacked out of their
19   opposition but to the extent we understand it -- does not meet
20   the critical or necessary prong, which is, under the Second
21   Circuit law and under New York law, quite high.  As the Second
22   Circuit articulated in Krase v. Graco, 79 F.3d 346, the
23   information can be compelled, or disclosure can be compelled
24   when the claim or defense, quote, virtually rises or falls with
25   the admission or exclusion of the proffered evidence.  And they

G6ndgium

1    just -- they have not made that showing here.

2         They talk about the fact that they need this

3    information because the credibility of the plaintiff is key,

4    but the credibility of a plaintiff is key in many kinds of

5    cases and certainly very often in libel case, where truth or

6    falsity is sort of the ultimate issue being tried, and there is

7    obviously not a wholesale exception for libel or any case where

8    the plaintiff's credibility is central to the Shield Law.

9         They also focus heavily on the idea that the story

10   changed over time from what was published in 2011 and what was

11   published in 2015 and after and, in particular, the question of

12   whether Virginia had sex with Prince Andrew or not.  In 2011,

13   the article stated that there was not evidence that that

14   happened.  In 2015, after court papers stated that it had

15   happened, they then reported that it had.  But I would submit

16   that's less an issue of the story changing than what changed

17   was what the newspapers were comfortable publishing.

18        There is actually a Vanity Fair article about this

19   that was published later in 2011 that talks about how -- it

20   talks about Prince Andrew -- that's what the article is

21   about -- and it talks about the strictness of British libel

22   laws that likely are what contributed to newspapers sort of

23   hedging on that point.

24        This also is not a case where the journalist was an

25   eyewitness to events in her capacity as a citizen.  She wasn't

19

G6ndgium

1   there when whatever happened with Ms. Maxwell and Ms. Giuffre
2   took place, witnessing it as citizen Sharon Churcher.  All of
3   her knowledge about this comes from reporting as a reporter.
4           And, finally, because the documents all fall within
5   the Shield Law, a reporter should not be burdened with going
6   and sitting for a deposition where her counsel basically
7   objects to every question as privileged under the Shield Law.
8   And both the New York Court of Appeals and the Second Circuit
9   have emphasized that.  The New York Court of Appeals said, in
10  Holmes v. Winter, which we cite in our brief, where the entire
11  focus of a reporter's testimony would be on privileged topics,
12  quote, No legitimate purpose would be served by requiring a
13  witness to go through the formality of appearing to testify
14  only to refuse to answer questions concerning the information
15  sought.
16          And the Second Circuit, in Gonzalez, talked about the
17  dangers that if parties to a lawsuit were free to subpoena the
18  press at will, it would become standard operating procedure,
19  and the resulting wholesale exposure of press files to
20  litigants' scrutiny would burden the press with heavy costs of
21  subpoena compliance and could otherwise impair its ability to
22  perform its duties.
23          Finally, even setting aside the Shield Law, the scope
24  of the subpoena is very broad and overly burdensome even just
25  as a third party.  These communications go back at least five

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G6ndgium

1    years, if not more.  Ms. Churcher was employed at different

2    newspapers and is a freelancer, so we are talking about

3    multiple email accounts.  So even just gathering this broad

4    scope of communications which aren't limited by time or

5    specific subject matter would be quite burdensome, but, again,

6    because the Shield Law applies, a fortiori, as a journalist,

7    she should not be put to that burden.

8              THE COURT:  Thank you.

9              MR. PAGLIUCA:  Your Honor, I start with -- I would

10   like to read to the Court an example of Ms. Churcher's

11   involvement in this case.  I have this as an audio file and if

12   I was allowed to bring my cell phone in, I would play it, but I

13   wrote it down to read it to the Court.

14             MS. McCAWLEY:  Excuse me, your Honor.  I just want to

15   make sure that we are not -- some documents have been labeled

16   confidential, which is why there are redactions and I believe

17   there are other individuals present in the courtroom --

18             THE COURT:  Yes.  Find out what it is.

19             MS. McCAWLEY:  Thank you.

20             THE COURT:  No.  Confer with counsel.

21             MR. PAGLIUCA:  This is not a document that has been

22   produced by the plaintiffs, and it has never been labeled as

23   confidential in connection with this case.

24             MS. McCAWLEY:  Sorry.  I was concerned about that.

25             MR. PAGLIUCA:  So, this is a voice message that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G6ndgium

1   Ms. Churcher left for Paul Cassell, who is a lawyer in this

2   case who entered an appearance in this case, in February of

3   2015.

4           On February 5, 2015, your Honor, it starts out:  Paul,

5   it's Sharon.  I wanted to discuss and with you on a deep

6   background basis something that's in my file.  I, as you know,

7   feel almost like a friend of Virginia's.  I think that the FBI

8   affidavit was pretty close to perjury.  Give me a call when you

9   get a chance.  On a deep background basis, if it's not going to

10  be a conflict for you, it's something that I wanted to get your

11  advice on.  Take care.  Bye-bye.

12          This voice message is troubling on a number of levels,

13  your Honor, in connection with this case.  First, it has never

14  been provided to us, and there is a lawyer who has entered an

15  appearance in this case.  We have asked for this kind of

16  discovery from the plaintiff and it has never been provided,

17  and it's germane to the issues before the Court.  But what it

18  reveals is that this is not Ms. Churcher's first interaction

19  with Mr. Cassell, lawyer for the plaintiff.  They are on a

20  first-name basis.  She is feeling free to call him and leave

21  messages for him.

22          And what she wants to discuss is apparently an

23  affidavit prepared by the FBI that's been provided to

24  Ms. Churcher by someone; I don't know whom, your Honor, but I'm

25  going to presume it was provided to Ms. Churcher by the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G6ndgium

1    plaintiff.  That's troubling as well because we went through

2    litigation in this case about our access to alleged

3    public-interest privileged documents that were not turned over

4    to us but were submitted in camera to the Court.  But to the

5    extent that that's part of those documents and Ms. Churcher has

6    it, that's a problem for the discovery process in this case.

7              And it's a problem for Ms. Churcher, your Honor,

8    because it's clear, as is attached to our papers, that

9    Ms. Churcher's role in this entire ordeal was not simply a

10   journalist.  Ms. Churcher is a self-described friend.  She is a

11   self-described adviser.  She's a self-described confidante.

12   She is a self-described advocate.  In many instances throughout

13   this ordeal, Ms. Churcher was acting as a source of information

14   to Mr. Edwards, who is another lawyer who has entered an

15   appearance in this case, and to law enforcement.

16             The Shield Law only applies when journalists are asked

17   to disclose information received in the course of gathering or

18   obtaining news for publication.  And Ms. Churcher's activities

19   in connection with this case are far outside of those bounds.

20   To be clear, we don't want that information from Ms. Churcher.

21   So whatever information Ms. Churcher has that was indeed

22   obtained in her job in the course of gathering or obtaining

23   news for publication, we haven't subpoenaed that information.

24             But I suggest, your Honor, that the blanket notion

25   that Ms. Churcher can't sit for a deposition in this case is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G6ndgium

1    simply wrong, and these issues need to be resolved on a

2    question-and-answer basis by Ms. Churcher, because her role in

3    connection with this case far exceeded any role as a

4    journalist.

5            Indeed, your Honor, Ms. Churcher is a fact witness in

6    this case.  The Shield Law relied on is only applicable when

7    the journalist is asked to disclose information, again,

8    received in the course of gathering or obtaining news for

9    publication.  And much of the information that we are asking --

10   if, indeed, it is not all -- from Ms. Churcher has nothing to

11   do with information she gathered or collected in the course of

12   gathering news for publication.

13           We have Ms. Churcher meeting with the plaintiff in

14   early 2011 and then conducting a week-long series of interviews

15   leading to the publications in March of 2011.  We then go

16   through another five years here where the story changes, and it

17   is reasonable, I believe, to believe that the story is changing

18   not because of the truth of the story but because of

19   information that's being given to the plaintiff and she is then

20   changing her story to make it more salacious and more sellable

21   to various people through the world.

22           There is a series of exchanges between the plaintiff

23   and Ms. Churcher that we have in email communications that have

24   been provided to the Court that demonstrate this course of

25   conduct over time.  We also have a series of communications

24

G6ndgium

 1    between the plaintiff and law enforcement and the plaintiff's

 2    lawyers that are not news-gathering activities.  These are

 3    wholly outside of the process of gathering news.  And they are

 4    sharing information back and forth, and Ms. Churcher is

 5    providing information to Mr. Edwards, counsel in this case.

 6    Ms. Churcher is advising the plaintiff on how to deal with her

 7    own lawyer in connection with maximizing her return on

 8    publishing details that appear to be provided to the plaintiff

 9    by Ms. Churcher.  All of this is outside the bounds of any

10    Shield Law or any privilege.

11           I think the Court knows -- I'm sure the Court is

12    exhausted with all of the pleadings that have been filed in

13    this case related to discovery.  I believe we have exhausted

14    all avenues available to us to obtain this information.  There

15    is really no place else to go.  And so there is -- I think it

16    is not well founded, your Honor, that there is some notion that

17    we have not done everything that we can to get this information

18    from the plaintiff, Microsoft, other places before turning to a

19    subpoena to Ms. Churcher.

20           Ms. Churcher is likely the only source of this highly

21    relevant information, which is this 24-page fabricated diary

22    and the testimony around that, communications with law

23    enforcement and the FBI that have no legitimate investigative

24    reporter purpose.

25           So, for those reasons, Judge, I believe the Court

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

25

G6ndgium

1    should deny the motion to quash, we should be allowed to

2    proceed forward with the deposition of Ms. Churcher.  If there

3    are particularized objections to the questions because counsel

4    believe that those invade some privilege, they should be raised

5    at that time, and we go forward on a question-by-question basis

6    because most of this information will not be subject to any

7    privilege.

8                    Thank you.

9                    MR. FEDER:  May I be heard briefly?

10                   THE COURT:  Mm-hmm.

11                   MR. FEDER:  Thank you.  Just very briefly.

12                   First of all, the voicemail that my colleague read is

13   totally consistent with news gathering.  She mentions that it's

14   on deep background, and in trying to cultivate the source she

15   describes herself as almost a friend.  Again, I don't think

16   that type of less formal communication is indicative of a

17   transformation from a journalist into something else.

18                   But more problematically, we haven't heard that

19   voicemail.  We haven't seen any of the emails they are talking

20   about because they are redacted; the exhibits containing them

21   were filed under seal.  So we don't know exactly which pieces

22   of information they are trying to seek and which pieces of

23   information they are claiming are not subject to the privilege.

24                   I think we can all agree that Ms. Churcher is in fact

25   a journalist, that she did in fact publish stories from

G6ndgium

```
1    actually going back to 2007 that Virginia wasn't named, but
2    from 2007 and certainly 2011 onward, publishing stories about
3    these matters.  So, clearly the Shield Law is floating around
4    here at a minimum somewhere.
5            And they have to make a clear and specific showing for
6    each piece of information that they claim either the Shield Law
7    doesn't apply because she wasn't acting in her capacity as a
8    journalist or that the Shield Law is overcome because it's
9    critical or necessary and they've exhausted alternative
10   sources.  And the Shield Law itself provides that the Court
11   shall order disclosure only of such portions of the news sought
12   as to which the above-described showing has been made and shall
13   support such order with clear and specific findings made after
14   a hearing.
15           So we can't go forward and just deny the motion to
16   quash entirely and just go to a deposition and start answering
17   questions when the Shield Law at a minimum applies to, we would
18   submit, all of it but at a minimum a substantial portion of the
19   information.  We need to see what they're specifically talking
20   about here.
21           THE COURT:  Thank you very much.  I will reserve
22   decision.
23           The motion to quash the Epstein --
24           MR. POE:  May I approach the podium, your Honor?
25           THE COURT:  Yes.  Of course.
```

G6ndgium

1          MR. POE:  Good afternoon, your Honor.  Gregory Poe on

2     behalf of non-party Jeffrey Epstein.  With me, your Honor, is

3     my colleague Rachel Li Wai Suen.

4          THE COURT:  Yes.

5          MR. POE:  Yes, your Honor.  Thank you.

6          We've attempted to be thorough in our briefing so I

7     won't belabor the issues.  I think the key issue is whether in

8     fact an undue burden would exist if Mr. Epstein were subjected

9     at this point to a deposition.  The plaintiff concedes, as the

10    law requires, that evidence must be relevant and admissible.

11    And here the examples the plaintiff's counsel has offered with

12    respect to a 2010 deposition in a different proceeding where

13    Mr. Epstein apparently answered some questions doesn't add

14    anything that the public record already doesn't reveal.  So, in

15    our view, that would not justify a deposition, which leaves

16    really the Fifth Amendment implications that have been

17    represented will be made, and that raises the LiButti issue.

18         And under LiButti, your Honor, really the permeating

19    factor is control.  And the typical case -- really, most of the

20    cases, to the extent courts have addressed this issue, are

21    employee invocations where the corporation for which the

22    employee works is the party, and there the invocation can be

23    imputed because it is controlled.  There is no control here,

24    and the factors that exist don't justify the deposition under

25    the LiButti analysis.  And I would point the Court, as I'm sure

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G6ndgium

1    the Court has reviewed, to docket 228 -- that's the defendant's

2    pleading -- at pages 16 to 18, which lays out both in redacted

3    form, which I have not reviewed, and unredacted form, various

4    bases for why LiButti has not been met here by the plaintiff.

5          But the alternative argument the plaintiff makes,

6    which is this is not ripe for decision, while we certainly

7    concede that it would not be something that is the usual

8    practice in a typical case, this is not a typical case, we

9    would respectfully submit.  And we would ask the Court consider

10   as an alternative holding in abeyance any deposition of

11   Mr. Epstein until the record that the plaintiff refers to has

12   been developed.  That would not result in prejudice to either

13   party, and it would not subject Mr. Epstein to a burden of a

14   deposition or the cost or inconvenience, which, of course, need

15   to be considered with respect to a third party under Rule 45,

16   when, in fact, if we are correct that no litigation purpose

17   would be served, it would by definition, in our view, be an

18   unnecessary cost and inconvenience and, therefore, an undue

19   burden.

20         Finally, your Honor, if the Court -- and, ultimately,

21   if Mr. Epstein is not granted relief with respect to this

22   motion, we would ask in the alternative that the Court prohibit

23   videography for the reasons that we have outlined in our

24   briefs.  The plaintiff's opposition states that Mr. Epstein is

25   asking for preferential treatment.  We make legal arguments,

G6ndgium

1    your Honor.  Whether the Court agrees or disagrees with our

2    legal arguments, Mr. Epstein is not asking to be treated better

3    or worse than anybody else under the law.

4            So with that, your Honor, we -- if the Court has any

5    questions, I am prepared to answer them.

6            THE COURT:  Thank you.

7            MR. POE:  Thank you.

8            MS. McCAWLEY:  Your Honor, may I be heard on the

9    motion to quash, please?

10            So with respect to Mr. Epstein, obviously the Court

11    has heard from us previously.  He is at the center of this

12    conspiracy, we allege, with Ms. Maxwell, the defendant.  It

13    would be highly prejudicial to the plaintiff here to not be

14    able to take his deposition.

15            To accommodate his concerns, even though he was

16    sighted just even days ago by his New York mansion, we have

17    agreed to fly down to the U.S. Virgin Islands to handle that

18    deposition.

19            With respect to his concerns over videography, he said

20    he was concerned that that would be leaked to the media, we

21    have a confidentiality order in place in this case and we will

22    gladly mark that as confidential so that is not a concern.

23            It's very important that we are entitled to ask him

24    those questions.  I know his counsel has stated that he intends

25    to take the Fifth.  As the Court well knows, there are many

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

G6ndgium

1    questions for which you have to have a basis to take the Fifth,

2    so it can't be just a carte blanche taking of the Fifth.  So

3    there will be questions that he can answer during that

4    deposition.

5            In addition, we're entitled to see his demeanor during

6    that, to have the jury see his demeanor on video if this goes

7    to trial.  So it's critical that we are entitled to take that

8    deposition of Mr. Epstein, who is the co-conspirator here.

9            With respect to the LiButti case, your Honor, that

10   case addresses, as the Court may well know -- it is a Second

11   Circuit case -- it addresses the standard by which a court can

12   allow a nonparty's invocation of the Fifth Amendment to have an

13   adverse inference against a party in a litigation.  We contend

14   that we meet all of the factors of LiButti, but at this point

15   that would not be the time for the Court to make that decision.

16   Obviously, the deposition needs to take place.  We need to have

17   a record of what he is taking the Fifth on, and then we can

18   make those arguments presumably in a motion in limine for why

19   we believe that that adverse inference should apply.

20           So, your Honor, I submit to you that this deposition

21   is critical to us.  We've done our part in trying to

22   accommodate this witness, and we believe that the deposition

23   should move forward and the motion to quash should be denied.

24           Thank you.

25           MR. PAGLIUCA:  Your Honor, may I make some comments on

G6ndgium

1    this motion as well?

2         THE COURT:  Yes.

3         MR. PAGLIUCA:  Thank you.

4         Your Honor, first, I think what I'd like to say to the

5    Court is that, indeed, I wish Mr. Epstein's deposition could go

6    forward.  I have every reason to expect that should Mr. Epstein

7    testify and testify truthfully, his testimony would be of

8    enormous support and corroboration of Ms. Maxwell's version of

9    events in this case.

10        It's important to note, your Honor, that Ms. Maxwell

11   was not the subject of this investigation that led to

12   Mr. Epstein's being charged and pleading guilty.  We just

13   finished the deposition of Detective Recarey, who was the lead

14   deposition -- the lead detective in the case, and he agreed

15   that throughout this investigation he never spoke to

16   Ms. Maxwell.  No one identified Ms. Maxwell as being involved

17   in any of the alleged crimes.  He did not seek any indictment

18   or prosecution against Ms. Maxwell.  And his only investigation

19   relative to Ms. Maxwell was to simply look her up on the

20   Internet.

21        There is no surveillance footage of Ms. Maxwell.  She

22   is not named in any of the affidavits that are filed with the

23   court.  So, in short, Ms. Maxwell was not implicated in any of

24   the conduct that Mr. Epstein was alleged to have committed.

25        It's important background, your Honor, for the next

G6ndgium

1    point here, because the plaintiff has not raised what I think

2    is a very important issue here with regard to the Fifth

3    Amendment, and that is does Mr. Epstein indeed have the ability

4    to assert a Fifth Amendment privilege now in the context of

5    this litigation.  And there are a number of factors that are

6    considered, the first being, and I think it is important to

7    recognize, Mr. Epstein was granted immunity by the United

8    States Attorney in the District of Florida for the conduct that

9    I believe he is going to be questioned about.  And I don't

10   believe that it is appropriate for a witness to assert a Fifth

11   Amendment privilege after they have been granted immunity by

12   the prosecuting authority under 18 United States Code 6001.

13   So, I don't think that there has been any exploration of

14   whether Mr. Epstein can indeed invoke his Fifth Amendment

15   privilege.

16          He also pled guilty to state charges which likely

17   would act as a jeopardy bar and prohibit Mr. Epstein from

18   asserting his Fifth Amendment privilege in the state system to

19   the extent that the immunity from the federal government

20   doesn't cover him, which I submit that it would.

21          There is also the statute of limitations, your Honor,

22   which seems to me has long expired with regard to any of the

23   allegations in this case.

24          Now, why do I raise that, Judge?  They don't really

25   want Mr. Epstein to testify.  That's the point here.  They want

33

G6ndgium

1    to be able to have him assert his Fifth Amendment privilege so
2    that they can then try to back-door this against Ms. Maxwell.
3    And, in effect, they are creating their own little dichotomy
4    here, which is he's taking the Fifth, we want him to take the
5    Fifth, because then we get to just do a list of questions about
6    everything that we want to have an adverse inference about as
7    it relates to Ms. Maxwell, not as to Mr. Epstein.  That is the
8    problem, because they haven't done what they should do to get
9    to that point in the first place.  I think that is a real issue
10   and a real problem for this motion before the Court now.
11        This is simply an attempt to manufacture -- and I use
12   that word deliberately, your Honor -- manufacture self-serving
13   evidence that they can then try to present to a jury through
14   this derivative adverse inference.
15        Final comment:  I have never had a court allow a
16   witness to come into court and assert a Fifth Amendment
17   privilege, whether that be in a criminal case or a civil case.
18   I've never had a court allow a jury to be shown someone's
19   deposition while they are asserting a Fifth Amendment
20   privilege.  I don't understand the point of that.  And it seems
21   to me there is no point in allowing a videotaped deposition of
22   somebody who is going to sit there and say to every question
23   "On the advice of my counsel, I assert my Fifth Amendment
24   privilege."  There is nothing to be served by the added expense
25   of that process.

34

G6ndgium

1          So, your Honor, this is Mr. Epstein's fight, it is not

2     Ms. Maxwell's fight, but it becomes Ms. Maxwell's fight to the

3     extent that we're trying to create evidence down the road that

4     is used against Ms. Maxwell in this proceeding.

5          Thank you.

6          THE COURT:  Thank you.

7          Yes.  Anything further?

8          MR. POE:  Nothing further, your Honor.  Thank you.

9          MS. McCAWLEY:  Your Honor, may I just briefly

10    address -- defendant's counsel didn't file a brief on this so I

11    just want to take a few moments to address the points he has

12    just raised very briefly.

13         First, we would love to have Mr. Epstein give complete

14    testimony in this case.  I look forward to that.  I hope that

15    he will do that for us, and that is why we want to take his

16    deposition.  Ms. Maxwell had given an indication she was going

17    to take the Fifth.  When we deposed her, she didn't.  So things

18    may change.  We need his deposition.

19         Second, with respect to the representations regarding

20    the deposition of Detective Recarey which occurred earlier this

21    week, Detective Recarey did say that he sought to interview

22    Ms. Maxwell in the course of that and did acknowledge that

23    Ms. Maxwell is in the police reports.  I just want to make sure

24    that that is corrected on the record.

25         Thank you, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    35
     G6ndgium

1              THE COURT:  Thank you, all.

2              I will reserve decision.

3              MS. McCAWLEY:  Thank you.

4              THE COURT:  Thank you, all.

5

6                             -  -  -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300